UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TROY MILLS, | : | Case No. 1:12-cv-465 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND
SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED;
AND (2) THIS CASE IS CLOSED**

This is a Social Security disability benefits appeal.  At issue is whether the

administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and

therefore unentitled to supplemental security income ("SSI") and disability insurance

benefits ("DIB").  (*See* Administrative Transcript ("Tr.") (Tr. 15-24) (ALJ's decision)).

**I.**

On August 25, 2008, Plaintiff filed applications for DIB and SSI.  (Tr. 150-160).

Plaintiff alleged disability since March 1, 2007 due to a combination of impairments,

which include: lumbar degenerative disc disease with radiculopathy, PTSD, bipolar

disorder, hypertension, insulin-dependent diabetes, carpal tunnel syndrome in his left

hand, and internal derangement of his left shoulder.  (Tr. 150-160, 177, 185-191).  The

Social Security Administration denied Plaintiff's claims initially and upon

1

reconsideration.  (Tr. 83-88, 91-97).  Plaintiff then timely requested a hearing before an

ALJ.  (Tr. 98).  Plaintiff went before an ALJ on July 16, 2010, at which hearing Plaintiff,

two medical experts, and a vocational expert testified.  (Tr. 107-135).  The ALJ issued an

decision unfavorable to Plaintiff on October 12, 2010.  (Tr. 12-24).  Plaintiff filed a

request for review with the Appeals Council which was denied.  Subsequently, Plaintiff

timely filed an appeal with this Court.

At the time of the hearing Plaintiff was 47 years old with one year of college and

past work as a GED teacher, school-bus driver, and self-employed janitor.  (Tr. 178, 182).

The ALJ's "Findings," which represent the rationale of his decision, were as

follows:

1. The claimant meets the insured status requirements of the Social Security Act
   through June 30, 2010.

2. The claimant has not engaged in substantial gainful activity since March 1,
   2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease,
   arthritis, post-traumatic stress disorder, depression, bipolar disorder,
   polysubstance dependence (in partial remission) (20 CFR 404.1520(c) and
   416.920(c))).

4. The claimant does not have an impairment or combination of impairments that
   meets or medically equals one of the listed impairments in 20 CFR Part 404,
   Subpart P, Appendix 1 (920 CFR 404.1520(d), 404.1525, 404.1526,
   416.920(d), 416.925, 416.926).

5. After careful consideration of the entire record, the undersigned finds that the
   claimant has the residual functional capacity to perform sedentary work as
   defined in 20 CFR 404.1567(b) and 416.967(b) except that he cannot be
   required to lift more than 10 pounds, either occasionally or frequently; cannot
   be required to push or pull more than 10 pounds with hand or foot controls;

cannot be required to stand and walk for more than 2 hours; can sit for at least 6 hours in an 8 hour workday; cannot be required to use ladders, ropes, or scaffolds; cannot be required to use ramps or stairs more than occasionally; cannot be required to balance, stoop, kneel, crouch, or crawl more than occasionally; due to mental limitations, he cannot be required to understand, remember or perform more than simple, routine tasks in a routine and predictable environment; and cannot have more than occasional and superficial contact with others.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on February 2, 1963 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2007 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-24).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations, and was therefore not entitled to SSI or DIB. (Tr. 24).

On appeal, Plaintiff argues that: (1) the ALJ erred when he failed to account for all the limitations caused by Plaintiff's severe and non-severe impairments which led to a flawed RFC finding; (2) the ALJ failed to properly explain how he weighed the medical opinion evidence; and (3) the ALJ failed to apply the proper criteria when assessing Plaintiff's credibility.  The Court will address each error in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  In performing this review, the Court considers the record as a whole.  *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled.  As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts.  If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  That is, he must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job in the national economy.  42 U.S.C. § 423(d)(1)(A).

## A.

The record reflects that:

## A.  Medical Evidence[1]

### 1. Physical Impairments

Plaintiff has treated with the VA Medical Center in Cincinnati for many years. One of Plaintiff's main impairments is his lumbar degenerative disc disease with radiculopathy.  An MRI from as early as August 2003 revealed a moderate disc protrusion at L4-5 and a small to moderate disc protrusion at L5-S1 (Tr. 354-355), and EMGs dated July 23, 1999 and July 8, 2008 revealed evidence of a chronic L5-S1 radiculopathy in Plaintiff's left lower extremity.  (Tr. 359, 467-469, 943-944).  A lumbar MRI dated April 16, 2008 revealed moderate bilateral facet hypertrophy and ligamentum flavum redundancy at both L4-5 and L5-S1.  (Tr. 271).  At L4-5, there was mild to moderate disc height loss with disc dehydration and a mild broad-based disc bulge with minimal circumferential narrowing of the central canal with mild flattening of the ventral thecal sac, and "the superior hypertrophic facets of L5 encroach into the neural foramina

---

[1]  The medical evidence in this case is voluminous and covers a significant date range, so only the most relevant records will be referenced.

and may abut the exiting L4 nerve root bilaterally slightly more apparent on the left."

(Tr. 271-272).  At L5-S1, there is moderate disc height loss with a mild to moderate sized

broad based disc bulge which extends into the left neural foramina, along with a

superimposed central disc protrusion which is slightly asymmetric toward the left, and

"soft tissue obliteration of the lateral recess bilaterally left greater than right" with

"encroachment of the traversing S1 nerve root bilaterally more apparent on the left," with

minimal thecal sac compression, vacuum disc phenomena present, and "moderate to

severe right and severe left neural foraminal stenosis."  (Tr. 272).

On September 19, 2008, Plaintiff consulted with Dr. Koppenhoefer for pain

management.  (Tr. 412).  Dr. Koppenhoefer observed that Plaintiff had a reduced range of

motion in his lumbar spine and a positive straight leg raise test on the left, but normal

strength and sensation.  (*Id*.)  Dr. Koppenhoefer referenced another MRI dated April 16,

2008, which revealed degenerative changes at the L4-5 level and a moderate-sized disc

bulge which extended into the left neural foramen at the L5-S1 level with encroachment

on the bilateral (left greater than right) S1 nerve roots, and concluded that Plaintiff's pain

was caused by the disc at the L5-S1 level.  (*Id.,* Tr. 1117).  This assessment is consistent

with an earlier diagnosis in July 2003 of lumbar radiculopathy, when Plaintiff was treated

with a series of epidural steroid injections (Tr. 860, 864, 1184), and at least one

neurosurgeon reported in 2002 that Plaintiff was a candidate for L4- 5 and L5-S1

nucleoplasty.[2]  (Tr. 919).  Plaintiff was provided with a back brace[3] in May 2008.  (Tr. 476).  Examinations by VA physicians have shown varying amounts of muscle weakness, sensory changes, and straight leg raise test results.  (Tr. 1161, 1333).

In addition to his chronic back pain, Plaintiff has several other physical impairments.  He was treated for carpal tunnel syndrome in his right hand in April 2008.  (Tr. 480-481).  Plaintiff was diagnosed with diabetes in the late 1990s.  Shoulder x-rays in September 2009 revealed mild hypertrophy to the acromioclavicular ("AC") joints, bilaterally and along the inferomedial aspect of the left glenohumeral joint, as well as an os ocromiale on the left; the AC joint hypertrophy explains Plaintiff's complaints of right shoulder pain. (Tr. 1294).  Plaintiff's shoulder pain was treated with a steroid injection on April 5, 2010.  Dr. Heberling, who performed the injection, diagnosed AC joint arthrosis and a suspected rotator cuff tear.  (Tr. 1369).  Plaintiff's chronic neck pain (*see, e.g.*, Tr. 1339) is also due to osteoarthritis.  An x-ray of his cervical spine in June 2009 revealed straightening of the normal cervical lordosis and a large ossified fragment present posterior to the C5 and C6 spinous processes, representing nuchal ligament calcification. (Tr. 1296).

---

[2]  Nucleoplasty is a treatment option for people suffering prolonged and severe back pain resulting from a disc herniation that did not respond to conventional treatment.

[3]  There is also reference to Mr. Mills' use of a cane, back brace, and TENS unit as early as 2003.  A TENS unit is predominately used for nerve related pain conditions.  It sends stimulating pulses across the surface of the skin and along the nerve strands.  The stimulating pulses held prevent pain signals from reaching the brain.

Plaintiff's treating general practitioner at the Cincinnati VA, Dr. Reddy provided her professional medical opinion about Plaintiff's physical limitations on January 14, 2009. (Tr. 998-1002). Specifically, Dr. Reddy opined that Plaintiff can sit for 15 minutes at a time and up to two hours per day, can stand for 20 minutes at a time and stand and/or walk for fewer than two hours per day, can rarely lift up to ten pounds and never more, and should never perform postural activities such as kneeling, crouching, or climbing. (*Id.*) In addition, Dr. Reddy opined that Plaintiff will have "good" and "bad" days, will require unscheduled breaks at approximately 45 minute intervals for about 10 minutes each, and is likely to miss four or more days per month due to his impairments. (*Id.*) Dr. Reddy further opined that due to problems with his hands, Plaintiff is limited to using his hands for "fingering" (fine manipulation) only 50% of the workday, and may use his hands for "handling" (grasping, turning, or twisting objects) only 40% of the workday. (Tr. 1002).

### 2. Psychiatric impairments

Plaintiff had a psychiatric hospitalization in August 2005 (Tr. 574) and a prior intensive outpatient treatment program in September 2004. (Tr. 665). Plaintiff again began an intensive outpatient psychiatric treatment program after an inpatient stay (Tr. 431) for his psychological impairments in September 2008, which included frequent group therapy sessions and regular visits with therapists and psychiatrists (*see, e.g*., Tr. 369). Plaintiff relapsed on drugs and alcohol in August 2008 (Tr. 1091), but at the time of a psychological evaluation on September 28, 2008, Plaintiff was in early remission

8

from his polysubstance dependence.  (Tr. 394-397, 403).  Plaintiff was discharged

unsuccessfully from the intensive outpatient program in December 2008.  (Tr. 1135).

Plaintiff had episodes of further drug use; followed by another inpatient hospitalization in

January 2009, at which time he again achieved sobriety.  (Tr. 1307-1308; *see also* Tr.

1328*:* "polysubstance dependence in early full remission").  In fact, three separate urine

toxicity screens in February 2009 were negative for all drugs tested.  (Tr. 1300-1301).

Plaintiff requested individual therapy after the death of his wife in March 2009

and to help him avoid sabotaging himself during good periods in his life.  (Tr. 1324).

Plaintiff was also taking psychotropic medications to help control his depression and

PTSD.  (Tr. 1344).  At the time of an evaluation on March 9, 2009, Plaintiff described

past suicidal thoughts and had a guarded demeanor.  (Tr. 1352-1353).  The examiner

diagnosed PTSD; major depressive disorder; polysubstance dependence in early full

remission; and assigned a GAF of 45.[4]  (Tr. 1355).

Both of Plaintiff's treating psychiatrists completed mental residual functional

capacity forms.  Dr. Goldsmith's opinion was rendered only four weeks after Plaintiff

achieved sobriety, while Dr. Schmidt's opinion was rendered after a longer period of

sobriety.  These opinions show that Plaintiff initially had a great deal of mental

limitations (Tr. 1004-1009), but that with sobriety and mental health treatment, he has

---

[4]  The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) used by
mental health clinicians and physicians to rate subjectively the social, occupational, and
psychological functioning of adults, *e.g.*, how well or adaptively one is meeting various
problems-in-living.  A score of 41-50 indicated serious symptoms (*e.g.*, suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or
school functioning (e.g., no friends, unable to keep a job).

made improvements. Even so, he continued to be unable to maintain an acceptable

standard of attendance and punctuality, as Dr. Schmidt opined that Plaintiff is likely to

miss an average of two days of work per month. (Tr. 1009, 1429).

### B. Plaintiff's Testimony

Plaintiff testified that he was "dealing with nightmares of my traumas" about three

to four times a week. (Tr. 51). He also has difficulty sleeping, and is able to sleep only

about two hours, mostly with tossing and turning. (Tr. 51-52). As a result, Plaintiff

testified that he naps approximately four times per day for about 10-15 minutes each.

(Tr. 52). Plaintiff testified that he feels scared and feels as if things are "coming to an

end." (Tr. 53). He also testified that he has difficulty concentrating, especially on days

when he is not able to sleep. (*Id*.) Plaintiff stated that certain people trigger thoughts of

past abuse, and certain "voices" within a group of people cause high anxiety. (Tr. 54).

He often pretends that everything is okay, but he has thoughts of harming himself. (Tr.

54, 56).

Plaintiff testified that his pain level ranges from 7 to 8 out of 10 for most of the

day. (Tr. 59). He experiences pain in his lower back which shoots down his left leg.

(*Id*.) Plaintiff also experiences pain in his shoulders, which makes it difficult to raise his

arms or lift things. (Tr. 60). During the hearing, Plaintiff stood a few times because it

"hurt to sit in one spot for so long." (*Id*.) On "worse" days, Plaintiff uses a cane for

walking, which is usually four days per week. (Tr. 61).

During a typical day, Plaintiff goes to school a few hours and then comes home and sits in his bedroom and stares out the window.  (Tr. 55).  He lives with his mother, and she handles the household chores.  (Tr. 56).  Plaintiff testified that he experiences dry mouth and drowsiness as side effects from his medications.  (*Id.*)

### C. Medical Expert Testimony

#### 1. *Chukwuemeka Ezike, MD.*

At the hearing, Dr. Ezike added the diagnosis of arthritis in both shoulders to the list of "severe" impairments that he had provided in the answers to interrogatories which he had completed prior to the hearing.  (Tr. 36).  He testified that due to Plaintiff's shoulder arthritis, he would add to his written opinion the limitation that Plaintiff should only occasionally reach overhead with either upper extremity.  (*Id.*)  Dr. Ezike testified that he believed that Plaintiff had been compliant with all treatment recommendations (Tr. 37).  Dr. Ezike acknowledged Plaintiff's history of polysubstance abuse, but he testified that the polysubstance abuse is not material to the limitations caused by Plaintiff's lumbar degenerative disc disease.  (*Id.*)  Dr. Ezike also testified that it would be reasonable for Plaintiff to have absences from work due to his "severe" impairments, but he was unwilling to quantify how frequently such absences would occur.  (Tr. 41).

#### 2. *Terry Schwartz, Psy.D.*

At the hearing, Dr. Schwartz, a psychologist testified that there were no issues of non-compliance, but he believed that alcohol and substance abuse did contribute to

Plaintiff's psychological symptoms.  (Tr. 43).[5]  Dr. Schwartz believed that with "a full

sustained remission, there's nothing in the psychological profile which would preclude

[Plaintiff] from working."  (*Id*.)  Dr. Schwartz opined that Plaintiff retains the capacity to

complete a variety of tasks which do not require rapid, consistent pace and "indicates

appropriate social interaction."  (Tr. 44).  Although Dr. Schwartz testified that Plaintiff

would benefit from continued outpatient therapy for PTSD, depression and anxiety, he

stated that would not change the RFC he assigned to Plaintiff, even after he learned that

Plaintiff had recently been involved in an additional inpatient rehabilitation program and

an intensive outpatient program.  (Tr. 45).

### 3.  *Vocational Expert Testimony*

The vocational expert ("VE"), Ms. Janet Rogers, identified Plaintiff's past work as

a school bus driver (light, semi-skilled), delivery driver (medium, unskilled), cleaner

(light, unskilled), teacher's aide (light, semi-skilled), groundskeeper (medium, unskilled),

and job developer (sedentary, skilled).  (Tr. 71-72).

The first hypothetical question posed to the VE described an individual who can

perform light work; but who cannot use ladders, ropes or scaffolds; cannot more than

occasionally use ramps or stairs; cannot more than occasionally stoop or kneel; cannot

crouch or crawl; and who can understand, remember and perform only simple, routine

tasks in a predictable environment where contact with others is not more than occasional

and superficial.  (Tr. 73-74).  The VE testified that such an individual could perform

---

[5]  Dr. Schwartz noted that he did not have the complete file, because he was missing Exhibits
13F (VA records) and 15F (a mental impairment questionnaire).  (Tr. 36, 44).

Plaintiff's past work as a cleaner and could also perform other work, such as an inspector, assembler, and hand packer.  (Tr. 74-76).

The second hypothetical question used the same limitations for psychological impairments but changed the physical limitations to reflect those listed in Dr. Ezike's RFC.  (Tr. 75).  That hypothetical question described a person limited to sedentary work with no more than occasional overhead reaching; no climbing of ladders, ropes or scaffolds; only occasionally climbing of ramps or stairs; and no more than occasionally balance, stoop, kneel, crouch, or crawl.  (Tr. 75-76).  The VE testified that such an individual could not perform Plaintiff's past work but could do other work, such as a hand packer, assembler, and inspector.  (*Id*.)  The VE testified that a person limited in the manner described by Drs. Schmidt or Reddy would not be able to work competitively because the person would be absent too often.  (Tr. 77).

## B.

First, Plaintiff alleges that the ALJ failed to account for all of the limitations caused by his severe and non-severe impairments, which led to a flawed RFC finding.

If the Commissioner "find[s] a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process."  20 CFR §§  404.1523, 416.923.  "In other words, '[o]nce one severe impairment is found, the combined effect of all impairments must be considered, even if other impairments would not be severe.'"  *Simpson v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009).

Plaintiff claims that the ALJ failed to properly accommodate his lumbar DDD and arthritis by failing to include the RFC accommodations of alternating sitting and standing, providing for frequent rest periods, and limiting overhead reaching to occasional with both hands.[6]  The ALJ also failed to acknowledge that Plaintiff can be expected to be absent form work at least twice per month.[7]  Plaintiff argues that the failure to include these RFC limitations is not harmless error, because the VE testified that a person who has these additional work limitations will be unable to perform competitive work.

First, Plaintiff maintains that the ALJ was required to include a sit/stand option in the RFC to accommodate his lumbar DDD and arthritis.  (Doc. 13 at 12-15).  This argument collapses into Plaintiff's other allegations of error regarding the ALJ's assessment of the medical evidence and Plaintiff's credibility.  The ALJ did not find credible Plaintiff's evidence regarding the need for a sit/stand option, and thus was not

---

[6]  Dr. Ezike testified that Plaintiff could not reach overhead with either hand more than occasionally throughout the work day.  (Tr. 36-37).  While the ALJ included this limitation in the second hypothetical question he posed to the VE, he failed to include it in the RFC finding he made in his decision and failed to explain why he omitted that limitation.  (Tr. 19, 76).  Additionally, the ALJ failed to include an option to alternate sitting and standing as recommended by Dr. Reddy for Plaintiff's lumbar degenerative disc disease.  (Tr. 1000).

[7]  Dr. Reedy opined that Plaintiff can be expected to miss more than four days of work per month.  (Tr. 1002).  Dr. Goldsmith, one of the treating psychiatrists, opined that Plaintiff is "unable to meet competitive standards" for maintaining regular attendance and being punctual within customary, usually strict tolerances.  (Tr. 1006).  Dr. Schmidt, Plaintiff's psychiatrist, opined that Plaintiff can be expected to miss two days of work per month.  (Tr. 1429).  Even Dr. Ezike agreed that Plaintiff can be expected to have some attendance problems as a result of the pain and other limitations he experiences from his physical impairments.  The VE testified that if a person misses two or more days of work per month on a consistent basis, that person will not be able to sustain competitive work.  (Tr. 77).

required to include this limitation.  *Casey v. Sec'y of Health & Human Services*, 987 F.2d 1230, 1235 (6th Cir. 1993).  Plaintiff effectively invites this Court to reweigh or resolve conflicts in the evidence, an endeavor not authorized by 42 U.S.C. § 405(g).  Dr. Reedy recommended a sit/stand opinion (Tr. 1000-01), but the ALJ afforded her opinion little weight because: (1) it was unsupported by record evidence and (2) it was reached in January 2009 and thus did not account for subsequent evidence that Plaintiff's symptoms were not disabling.  (Tr. 22).  If the ALJ did not err in discounting Dr. Reedy's opinion, there is no independent error in failing to include a sit/stand opinion in the RFC.

Additionally, Plaintiff's medical evidence from 2008 showing degenerative disc condition and radiculopathy does not establish disabling symptoms.  *Casey*, 987 F.2d at 1234.  Plaintiff's evidence was reviewed by two physicians who concluded Plaintiff did not have disabling symptoms.  (Tr. 1359-1361; 1417-1418).

In November 2009, Dr. Wyatt conducted a consultative examination and reviewed Plaintiff's medical records in relation to a service-related VA disability claim.  (Tr. 1359-1361).  She concluded that Plaintiff had excellent range of motion and full strength in his back.  (Tr. 1360).  Dr. Wyatt noted that "during a flare-up or following repetitive use," Plaintiff would be "limited by pain but not by weakened movement, excess fatigability, endurance, or functional loss."  (Tr. 1360).  She opined that "[t]here is no objective evidence of painful motion, spasm, weakness, or tenderness" and that "[t]here is no postural abnormality, fixed deformity, or abnormality of the musculature of the back."  (Tr. 1360).  She found that Plaintiff's gait was unremarkable, he could rise to his toes and

heels without difficulty, and he had no incapacitating episodes during the past 12 month period due to his back condition.  (Tr. 1361).

In July 2010, Dr. Ezike agreed that Plaintiff had lumbar DDD and lumbar radiculopathy on the basis of the April 2008 MRI showing impingement and the July 2008 EMG showing signs of radiculopathy.  (Tr. 1417-1418).  But Dr. Ezike concluded that Plaintiff's condition did not meet or equal a listed impairment because "examination did not show muscle wasting or atrophy or weakness" and a "neurological exam was essentially unremarkable."  (Tr. 1418).

Plaintiff relied on evidence from 2003 and earlier to show that his lumbar DDD was worsening over time, and thus requires a sit/stand opinion.  (Doc. 13 at 12-13).  However, Plaintiff worked a janitorial service from March 2007 to February 2008, and then worked at a maintenance/janitorial position at the VA from June to December 2009.  Given the nature of the work, it is unlikely he was offered a sit/stand option.  Moreover, subsequent physicians did not require a sit/stand option.  (Tr. 1359-1361, 1417-1423).

The Commissioner concedes that the RFC does not accurately reflect Plaintiff's inability to reach overhead more than occasionally.  (Doc. 13 at 11).  However, the VE testified that a person with such a reaching limitation (who also had the limitations listed in the RFC) would be able to work as a sedentary hand packer, sedentary assembler, sedentary unskilled inspector, and sedentary unskilled laborer.  (Tr. 76-77).  Thus, the ALJ's omission does not undermine his overall conclusion that Plaintiff could do significant work in the national economy. *Coulter v. Comm'r of Soc. Sec.*, No. 01-1299,

2011 U.S. App. LEXIS 24214 at *8 (6th Cir. Nov. 2, 2001) (applying harmless error analysis to RFC determination).

Accordingly, to the extent the RFC did not accurately reflect Plaintiff's impairments, such omissions were harmless and the ALJ's RFC is supported by substantial evidence.

## C.

Next, Plaintiff alleges that the ALJ failed to properly explain how he weighed the medical opinion evidence.

The Regulations clearly state that a treating doctor's opinion must be given "controlling weight" if "well-supported" by objective evidence.  20 C.F.R. § 1527(d)(2). More weight is generally given to treating sources because they can provide a detailed, longitudinal picture of one's medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from objective findings alone or from reports of individual examinations such as consultative examinations.  *Id.*  "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors – namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, consistency of the opinion with the record a as whole, and the specialization of the treating source – in determining what weight to give the opinion."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (discussing 20 C.F.R. § 1527(d)(2)).

If an ALJ rejects the opinion of a treating physician, he must articulate clearly "good reasons" for doing so. *Wilson*, 378 F.3d at 544. In order to be "good," those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. In fact, the Sixth Circuit has held that the ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007).

The ALJ gave less weight to the opinions of Drs. Reddy and Goldsmith (the treating primary care physician and treating psychiatrist, respectively), because "the opinions are not fully supported by and are inconsistent with the objective medical evidence. Additionally, "the opinions cover an inferior longitudinal timeframe of records and are inconsistent with the credible portion of the activities of daily living evidence." (Tr. 22). Plaintiff argues that the ALJ failed to explain which objective evidence was inconsistent with their opinions and failed to identify which portion of these activities of daily living evidence he found credible. (*Id.*)

The ALJ determined that Dr. Reddy's opinion was not well-supported by objective medical evidence, was inconsistent with substantial record evidence, and was based on an inferior longitudinal perspective. (Tr. 22). Specifically, the ALJ maintained that Dr.

18

Reddy's opinion was based on Plaintiff's self-reported symptoms, which the ALJ found

not to be credible. (Tr. 21). Moreover, Dr. Reddy's treatment notes provide no

additional support for her opinion. (Tr. 354, 481, 490, 507, 526, 703, 1125). Dr. Reddy's

opinion was also inconsistent with respect to the clinical findings: (1) straight leg raise

limited to 10 degrees; (2) lateral bending 10% right and left; and (3) flexion 40 degrees.

(Tr. 998). Instead, the ALJ credited Dr. Ezike's opinion (Tr. 22), which noted that the

physical examination did not show muscle wasting, atrophy, or weakness, and a

neurological examination was essentially unremarkable. (Tr. 1061, 1418). The ALJ

cited substantial evidence in opposition to Dr. Reddy's opinion. Moreover, Dr. Reddy's

opinion is from January 2009 (Tr. 998-1002), whereas Dr. Ezike's opinion is from July

2010 (Tr. 1417-1423), and is thus based on a more comprehensive view of Plaintiff's

physical impairments. *Swett v. Comm'r of Soc. Sec.*, no. 3:11cv38, 2012 U.S. Dist.

LEXIS 37896, at *10 (S.D. Ohio Mar. 20, 2012) (reviewing physician may have superior

longitudinal perspective to treating physician).

Most notably, the ALJ identified Dr. Wyatt's examination as evidence that

Plaintiff's back condition was not disabling. (Tr. 21 at 1362). In November 2009, Dr.

Wyatt, a VA neurologist, performed a consultative examination of Plaintiff relating to his

claim for Veteran's disability benefits. (Tr. 1360). Dr. Wyatt found there was no

objective basis for Plaintiff's pain. (*Id*.) She opined that Plaintiff gave poor effort during

range of motion and strength testing, but found when Plaintiff gave full effort that his

"true range of motion" was excellent and his "true strength can easily be shown to be 5/5

throughout." (Tr. 1360-61).  The ALJ ultimately relied on Dr. Wayatt's conclusion that Plaintiff "has no incapacitating episodes during the past 12 month period with acute signs and symptoms due to intervertebral disc syndrome that required bed rest prescribed by a physician and treatment by a physician.'" (Tr. 21 (quoting Tr. 1361)).[8]

The ALJ concluded that Dr. Goldsmith's opinion was not entitled to controlling or significant weight because the timeframe of Dr. Goldsmith's treatment was between September 2008 and January 2009 (Tr. 1004-1009), and thus he only saw Plaintiff when his symptoms were at their apex.  In contrast, Drs. Schmidt and Schwartz agreed that Plaintiff's most severe symptoms occurred during periods of substance abuse, such as from September 2008 to January 2009, but otherwise much less severe.  (Tr. 1425, 1430, 1433-1435).  Thus, the ALJ properly discounted Dr. Goldsmith's opinion because he had an inferior longitudinal perspective.  (Tr. 22).  *See* 20 C.F.R. § 404.1527(d)(2)(I).  In fact, Dr. Goldsmith noted that Plaintiff's symptoms of PTSD and depression were manageable if he continued therapy, medication, and abstinence from drugs and alcohol.  (Tr. 18-19, 21-22, 1425, 1430, 1433-1435).  S*ullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 994 (6th Cir. 2007) (severe symptoms in short-term do not establish disability where treatment effectively controls symptoms).

---

[8]  Additionally, the record reflects that Plaintiff did janitorial work in the CWT program between June and December 2009.  While he had pain, he was able to continue working.  *See* SSR 96-2p (medical opinion not entitled to controlling weight if inconsistent with evidence of claimant's "ability to do work-related activities").  The Compensated Work Therapy ("CWT") program seeks to provide vocational opportunities to veterans.

Additionally, the ALJ found that Dr. Goldsmith's assessment was not supported
by the limited treatment notes.  In October 2008, Dr. Goldsmith wrote that Plaintiff "has
some depression but is managing it well" (Tr. 1244), the next month he wrote that
Plaintiff was talkative with some depression, no hopelessness, and pretty good insight
and judgment (Tr. 1188), and his subsequent notes do not substantially support his stark
assessment of Plaintiff's limitations (Tr. 1114-1115, 1121, 1128).

The ALJ largely credited Dr. Schmidt's opinion, but concluded that his statement
that Plaintiff would miss two or more days per month due to his mental impairments, was
not well-supported and was inconsistent with Dr. Schwartz's opinion.  (Tr. 22, 1429,
1435).  Dr. Schmidt opined that Plaintiff had sufficient mental ability and aptitude to do
unskilled, semiskilled, and skilled work, and found only mild functional limitations in
activities of daily living, maintaining social functioning, and maintaining concentration,
persistence, or pace.  (Tr. 1427-28).  She also wrote that Plaintiff's symptoms were
improved by medication and that his prognosis was good so long as he remained sober.
(Tr. 1425).  Accordingly, given these findings, it is not evident why Plaintiff would miss
two or more days of work per month due to his mental impairments.  (Tr. 1429).  This
opinion is inconsistent with Dr. Schwartz's opinion that Plaintiff "would be able to work

full time in a variety of vocational environments." (Tr. 1435).[9] Other than the finding

that Plaintiff would be absent two or more days per month, the ALJ adopted his

opinions.[10]

Dr. Schwartz's opinion is largely consistent with Dr. Schmidt's opinion – the

outlier is Dr. Goldsmith's opinion which was based on a limited snapshot of Plaintiff's

condition when his symptoms were at their apex. (Tr. 1004, 1425, 1430). Dr. Schwartz

reviewed Dr. Schmidt's opinion and agreed with her assessment that Plaintiff's most

severe level of impairment occurred while actively using drugs. (Tr. 1430-1431). Dr.

Schwartz also agreed with Dr. Schmidt's assessment that Plaintiff continued to have

symptoms of PTSD and depression while sober, but found that there was no evidence of

---

[9]  Plaintiff claims that his history of missed appointments shows that he would regularly miss
work. (Doc. 13 at 17). However, Dr. Schmidt's opinion does not indicate that she knew of
Plaintiff's history of missed appointments or based her estimate on that history (Tr. 1425-1430),
and the record does not support Plaintiff's assertion that his past history of missed appointments
shows that he would miss two or more days of work per month. In fact, many of Plaintiff's
citations to missed appointments were during periods when Plaintiff was actively abusing
substances or what in a drug rehabilitation program (*See, e.g.,* Tr. 553 (using drugs and alcohol
in August 2005); Tr. 752-754 (considering drug rehabilitation in December 2005); Tr. 318, 762-
764, 775-777, 809 (tested positive for cocaine and THC in October 2003 and declined to give
urine sample in November 2003); Tr. 321, 864-868 (abusing substances in June and July 2003
when missed occupational therapy appointment); Tr. 959-960, 1114, 1134, 1164 (Plaintiff
declines to participate in outpatient or residential substance abuse treatment program and was
actively using cocaine in January 1999); Tr. 962-964 (Plaintiff missed appointments in substance
abuse outpatient program); Tr. 1030, 1195-119 (Plaintiff requests admission to inpatient rehab,
admits marijuana use in November 2008, urine test shows presumptive use of cocaine and
marijuana).

[10]  *See, e.g.*, Plaintiff "cannot be required to understand, remember or perform more than simple,
routine tasks in a routine and predictable environment" and he "cannot have more than
occasional and superficial contact with others" (Tr. 19); Plaintiff had "limited but satisfactory
mental abilities and aptitudes to do unskilled work and had unlimited or very good ability to
understand and remember very short and simple instructions, and ask simple questions or request
assistance" (Tr. 1427).

22

any marked impairments and any impairments were mild to moderate. (Tr. 1430, 1433). Accordingly, the ALJ reasonably afforded little weight to Dr. Goldsmith's opinion because it was not consistent with the subsequent opinions and it covered "an inferior longitudinal timeframe" than the subsequent opinions of Drs. Schmidt and Schwartz. (Tr. 22).

Therefore, the Court finds that the ALJ did in fact provide good reasons for affording Drs. Reddy and Goldsmith's opinions little weight in compliance with 20 C.F.R. § 404.1527(d)(2).

## D.

Finally, Plaintiff alleges that the ALJ failed to apply the proper criteria when assessing his credibility.

"The ALJ's credibility determinations are entitled to great deference because the ALJ has the unique opportunity to observe the witness's demeanor while testifying." *McFlothin v. Comm'r of Soc. Sec.*, 299 F. App'x 516, 523 (6th Cir. 2008). Here, the ALJ gave three reasons for discounting Plaintiff's credibility: (1) Plaintiff gave misleading or false testimony about his work; (2) he continued to abuse substances after the alleged onset date; and (3) his testimony was not supported by medical evidence. (Tr. 21).

### 1. *Lack of candor about post-onset work*

The record supports a finding that Plaintiff gave misleading or false testimony at the hearing. When the ALJ asked him if he had earned any income since March 1, 2007, he replied "No, sir." (Tr. 63-64). The ALJ asked Plaintiff to repeat his answer and he

23

again said "No, sir." (Tr. 64). When the ALJ noted that the records showed earnings of $6,100 in 2007, Plaintiff stated that he believed he was working for temp agencies and that he had been regularly changing jobs. (Tr. 64). In fact, Plaintiff worked from March 1, 2007 to February 28, 2008 for Beck-N-Call, a janitorial service. (Tr. 186). The record shows Plaintiff initially made $167 every two weeks and ultimately cleaned banks three days a week (20 hours a week) and made $400 biweekly. (*Id.*) At the hearing Plaintiff did not mention his steady work cleaning banks, and instead tried to minimize the significance of his work by making it seem sporadic and constantly changing. (Tr. 64). This misleading or false testimony and his subsequent failure to be candid when given the opportunity undermined his credibility. *Ball v. Astrue*, No. 09-208, 2010 U.S. Dist. LEXIS 11096, at *4 (E.D. Ky. Feb. 9, 2010) (claimant's "failure to tell the truth on various occasions – including during the administrative hearing" was "a sufficient basis for the ALJ to disbelieve [his] testimony concerning the severity of his impairments").[11]

Additionally, Plaintiff's testimony about his college coursework was similarly misleading. Plaintiff stated that he was taking 9 to 12 credits of basic classes. (Tr. 56-57). The record contains transcripts from Plaintiff's classes at Chatfield College, a two-year liberal arts college. In Spring 2010, Plaintiff earned a grade of "A" in ART107-Basic Painting and SCI202-Environmental Science and a grade of "B" in ENG101-English Composition I and MAT112- Contemporary College Math (Tr. 262). His

---

[11] The record also indicates that Plaintiff started a new job on or about June 22, 2009 in the CWT program, but Plaintiff made no mention of his participation in this program when questioned about post-onset date employment and earnings. (Tr. 64).

24

transcript also shows that he registered for four 200 or 300 level courses for Summer

2010 and five courses in Fall 2010. (Tr. 261). The ALJ did not rely on this information

in his credibility assessment, but it does rebut Plaintiff's argument that his testimony was

forthcoming and thus the ALJ should have given him the benefit of the doubt when

assessing his failure to mention his work activity in 2009.

### 2. *Drug use*

The ALJ also discounted Plaintiff's credibility based on his polysubstance abuse

"after the alleged onset date until at least December 2008." (Tr. 21). The ALJ explained

that this abuse meant that Plaintiff was not only "an unreliable historian," but also a "less

than credible witness concerning the severity" of his claimed limitations. (*Id.*) In fact,

Plaintiff's varying statements about his drug use in 2008 and early 2009 verify the ALJ's

concern.

On September 17, 2008, Plaintiff told Dr. Strawn, a VA psychiatrist, that he had

not consumed alcohol for several days and had not used cocaine for nearly three months.

(Tr. 431). The very same day, Plaintiff told Jennifer Hosler, a VA nurse, that he had been

sober for 4-5 months (Tr. 445), but told another VA nurse, Karen Ross, that had been

sober for 2 months (Tr. 447). On September 18, 2008, Plaintiff told Lori Buns, a VA

nurse practitioner, that he had been sober "off cocaine, alcohol and THC for 4 months"

and requested housing in the VA domiciliary. (Tr. 425). On September 30, 2008,

Plaintiff indicated to Bobbie Sloan, a VA nurse, that he had been sober for 6 months.

(Tr. 387). On November 5, 2008, Plaintiff denied any alcohol or drug use to Valerie

25

LaRocco, a VA psychology intern.  (Tr. 1207).  Two days later, he told Nurse Buns that

he had been sober for 2 months.  (Tr. 1199).  On December 31, 2008, Plaintiff denied any

use of substances to Ms. LaRocco.  (Tr. 1134).  On January 30, 2009, Nurse Buns

indicated that Plaintiff's most recent relapse started in August 2008, and he had been

using cocaine once a week until approximately January 23, 2009, and he drank alcohol

approximately one month ago.  (Tr. 1098).  Given these varying statements regarding his

drug use, substantial evidence demonstrates that Plaintiff was not a reliable historian.

(Tr. 21).

There is no indication that the ALJ questioned Plaintiff's credibility because he

was a drug user, rather it was that Plaintiff lied about this drug use.  *Teel v. Astrue,* No.

1:10cv613, 2011 U.S. Dist. LEXIS 144540, at *10 (S.D. Ohio Dec. 14, 2011) ("it also

seems self-evident that [the claimant's] admitted use of crack cocaine after the onset date

of disability has some probative force in assessing the credibility of a person claiming to

suffer from mental impairments"). [12]

### 3.  *Contrary record evidence*

The ALJ also described medical evidence that undermined Plaintiff's claims of

disabling symptoms.  (Tr. 21).  While the ALJ could not discount Plaintiff's credibility

solely because no medical evidence supported his claims, the regulations direct an ALJ to

consider medical evidence indicating that a claimant's symptoms were less severe than

---

[12] *See also Stroud v. Comm'r of Soc. Sec.,* No. 10-12515, 2011 U.S. Dist. LEXIS 116803, at *4
(E.D. Mich. Sept. 30, 2011) (claimant's history of substance abuse relevant to ALJ's credibility
finding).

claimed.  The ALJ discussed evidence that TENS, a back pain treatment, "has been very helpful in managing his pain."  (Tr. 12, 142, 460, 466).  He also noted a physical therapist's observation that Plaintiff "ambulates into the clinic without an assistive device with normal gait."  (Tr. 471).  The ALJ also cited Dr. Wyatt's November 2009 opinion, which concluded that Plaintiff "has no incapacitating episodes during the past 12 month period with acute signs and symptoms due to intervertebral disc syndrome that required bed rest prescribed by a physician and treatment by a physician."  (Tr. 21, 1361).  Dr. Wyatt opined that Plaintiff would be limited by pain, but not by "weakened movement, excess fatigability, endurance, incoordination, or functional loss" (Tr. 1360), which is inconsistent with Plaintiff's allegation of disabling symptoms (Tr. 60, 62).  Dr. Wyatt also noted that Plaintiff gave "very poor effort" during clinical testing and his true range of motion was excellent and his true strength was normal.  (Tr. 1360).  This evidence is inconsistent with claims of disabling symptoms.

Accordingly, there is substantial evidence supporting the ALJ's determination that Plaintiff's false testimony about post-onset work, drug use, and malingering, undermine his credibility.

## III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing.  The ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that Troy Mills was not entitled to disability insurance benefits and supplemental security

income, is found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**;

and, as no further matters remain pending for the Court's review, this case is **CLOSED**.


Date: 4/2/13                                                   *s/ Timothy S. Black*
                                                        Timothy S. Black
                                                        United States District Judge